# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-07-00551-CV

**Apollo Enterprises, Inc. and WorkingRx, Inc., Appellants**

**v.**

**ScripNet, Inc., Appellee**

#### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
#### NO. D-1-GN-07-002772, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

### O P I N I O N

This appeal requires us to consider the breadth of the exclusive jurisdiction that the legislature has vested in the Division of Workers' Compensation, Texas Department of Insurance (the Division)[1] to determine "disputes over the amount of payment due" from workers' compensation insurance carriers to reimburse pharmacies for health care provided to workers' compensation claimants. *See* Tex. Lab. Code Ann. § 413.031(c) (West Supp. 2009);[2] *Texas Mut. Ins. Co. v. Eckerd Corp.*, 162 S.W.3d 261, 263-67 (Tex. App.—Austin 2005, pet. denied); *Howell v. Texas Workers' Comp. Comm'n*, 143 S.W.3d 416, 428-29, 434-38 (Tex. App.—Austin 2004, pet. denied).

---

[1]  Prior to September 1, 2005, this jurisdiction was vested in the Texas Workers' Compensation Commission. Effective on that date, the legislature abolished the Commission and transferred its statutory responsibilities and rules to the Division. *See* Act of May 29, 2005, 79th Leg., R.S., ch. 265, §§ 8.001(b), .004(a), 2005 Tex. Gen. Laws 607, 608. For clarity, we will use "the Division" to refer to both the former and successor entities.

[2]  We will cite to the current versions of statutes and rules except where the parties have identified intervening substantive amendments that are material to our analysis.

Specifically, we must consider whether this jurisdiction extends to certain tort claims asserted against a pharmacy benefits manager by a pair of competitive rivals that contract with pharmacies to purchase assignments of workers' compensation reimbursement claims. In response to a plea to the jurisdiction based on exclusive jurisdiction and exhaustion-of-remedies grounds, the district court dismissed all of these tort claims. While we agree that some of the tort claims fall within the Division's exclusive jurisdiction and affirm the district court's judgment to that extent, we conclude that others do not, and reverse and remand the judgment as to those claims.

## BACKGROUND

Under Texas's workers' compensation system, the exclusive remedy of an injured worker against an employer who has workers' compensation insurance coverage is the recovery of "workers' compensation benefits." *See* Tex. Lab. Code Ann. § 408.001 (West 2006). In turn, a workers' compensation insurance carrier is liable for compensation for the employee's injury without regard to fault or negligence if the injury arises out of and in the course and scope of employment and the employee is subject to the workers' compensation act at the time of injury. *See id.* § 406.031 (West 2006); *see also id.* § 401.011(10) (West Supp. 2009) (defining "compensable injury"). The benefits that a covered employee who sustains a compensable injury is entitled to receive (and that a carrier is required to pay) include "medical benefits," or "all health care reasonably required by the nature of the injury as and when needed." *See id.* § 408.021 (West 2006); *see also id.* § 401.011(31) (defining "medical benefit"). Such health care may include "a prescription drug, medicine, or other remedy." *See id.* § 401.011(19)-(22-a), § 408.028 (West 2006).

Like other health care providers who serve workers' compensation claimants, pharmacies that provide pharmaceuticals and services to claimants have a statutory claim for reimbursement from the workers' compensation carrier that covers the employee. *See id.* § 408.027(a) (West Supp. 2009). The legislature has delegated broad authority to the Division to regulate the amounts of reimbursement that health care providers, including pharmacies, can recover from carriers. *See id.* § 408.028; *see also id.* § 413.011 (West Supp. 2009), § 413.012 (West 2006) (provisions generally governing health care reimbursement policies and guidelines). These powers and duties include promulgating by rule a "fee schedule" for pharmacy and pharmaceutical services that will "provide reimbursement rates that are fair and reasonable," "assure adequate access to medications and services for injured workers," and "minimize costs to employees and insurance carriers." *See id.* § 408.028(f). The legislature has mandated that "[i]nsurance carriers must reimburse for pharmacy benefits and services using the fee schedule as developed by this section, or at rates negotiated by contract." *See id.* § 408.028(g). The Division's rules have generally provided that the maximum allowable reimbursement (MAR) a provider can obtain for prescription drugs dispensed to workers' compensation claimants is the lesser of (1) "the provider's usual and customary charge for same or similar service" (U&C), (2) a formula based on the "Average Wholesale Price" (AWP) for the drugs, or (3) "a negotiated or contract amount." 28 Tex. Admin. Code § 134.503(a) (2009).

The parties to this appeal are businesses that compete in selling services to pharmacies to aid the pharmacies' recovery of workers' compensation reimbursement claims from carriers. Appellants Apollo Enterprises, Inc. and WorkingRx, Inc. are affiliated companies

whose interests generally align in this case (collectively, "WorkingRx" except when the distinction between the companies is relevant). To simply describe WorkingRx's business model, it enters into contracts with pharmacies whereby the pharmacies agree to present their individual workers' compensation reimbursement claims to WorkingRx for possible purchase. If a claim meets certain specified criteria, WorkingRx accepts an assignment of the claim and pays the pharmacy an amount determined by its contract with the pharmacy. Then, WorkingRx, as the assignee of the pharmacy, presents the reimbursement claim to the appropriate carrier, billing the carrier an amount purportedly based on its calculation of the applicable MAR.

WorkingRx explains that it earns its revenues in part from a margin between each reimbursement payment it obtains from a carrier and the amount it pays the pharmacy for the claim assignment. In other words, a pharmacy sells a reimbursement claim to WorkingRx for less than the amount WorkingRx bills the carrier. In return, the pharmacy is able to recover at least some of the value of the reimbursement claim while shifting to WorkingRx the administrative burdens, risks, and delays associated with obtaining payment on the claim from the carrier.[3] In addition to these margins, WorkingRx also earns revenue by obtaining rebates from pharmaceutical companies.

Appellee ScripNet, Inc. is a pharmacy benefits management company, or "PBM." ScripNet contracts with certain workers' compensation insurers to process and pay pharmacy reimbursement bills on their behalf. ScripNet also enters into contracts with certain pharmacies, which it terms "network pharmacies," to pay the pharmacy reimbursement bills owed to the

---

[3] These burdens and risks include uncertainties in determining coverage and the appropriate carrier when workers cannot present proof of coverage at point of service, as well as delays or denials of payment by the carrier.

pharmacies by the carriers with which ScripNet contracts. When a network pharmacy fills a prescription for an injured worker whose employer has workers' compensation insurance with a carrier with which ScripNet has a contract, the pharmacy bills ScripNet and ScripNet, on behalf of the carrier, reimburses the pharmacy. ScripNet then bills the carrier for the amount it paid the network pharmacy, plus an additional service fee specified in ScripNet's contract with the carrier.

ScripNet's contracts with its network pharmacies specify reimbursement rates that are generally lower than the MAR the pharmacies would derive from U&C or AWP. Somewhat similar to pharmacies who contract with WorkingRx, ScripNet network pharmacies accept reimbursement rates lower than those to which they would otherwise be entitled under the pharmacy fee guidelines in exchange for quicker or surer payment.[4] The pharmacies also obtain the benefit of access to the customer base of workers whose employers have workers' compensation coverage with carriers who have contracted with ScripNet.

Disputes have arisen when WorkingRx, as the assignee of pharmacy reimbursement claims, has presented those claims to carriers with which ScripNet has contracted to serve as a PBM. WorkingRx alleges that "[f]rom early 2000 to the present, ScripNet has remitted payment" to it in its capacity as a PBM. Many of these claims have originated from pharmacies that have contracted with both WorkingRx and ScripNet. In numerous instances, ScripNet, on the carriers' behalf, has taken the position that these claims are subject to a ScripNet contract with the originating pharmacy

_____

[4] However, WorkingRx contends that pharmacies realize this benefit only when an injured worker can present a ScripNet ID card at point of service. Further, as discussed below, WorkingRx maintains that ScripNet's contracts apply only to pharmacy reimbursement claims originating under those circumstances.

and paid WorkingRx only the contract reimbursement rates rather than the typically higher U&C- or AWP-based rates at which WorkingRx bills the carrier.

WorkingRx has disputed whether these reimbursement claims are subject to ScripNet's contract rates. Among other contentions, it has alleged that its "claim adjudication system" is "in preference to, and to the exclusion of, all other third-party billing companies, including ScripNet" and that ScripNet's contracts with pharmacies apply only to reimbursement claims generated by customers who present a ScripNet ID card at the point of sale. To the extent that any of its pharmacy reimbursement claims are in fact subject to ScripNet's contract rates as a matter of contract construction, WorkingRx alleges that ScripNet tortiously interfered with WorkingRx's pharmacy contracts by executing its contracts with the originating pharmacies while knowing they were already under contract with WorkingRx.

WorkingRx has also asserted that ScripNet, individually or in combination with others, has unlawfully caused pharmacies under contract with WorkingRx to breach their obligations to submit their reimbursement claims to WorkingRx and instead seek reimbursement directly from ScripNet. By "diverting" these claims around it, WorkingRx complains, ScripNet has deprived it of the entire benefit of claim assignments to which WorkingRx was contractually entitled. These benefits, WorkingRx contends, include not only any payments it would have received from the carriers but rebates it would have obtained from pharmaceutical companies.

WorkingRx has also accused ScripNet of unlawfully causing Texas Mutual Insurance Company to reduce its payments on reimbursement claims originating from pharmacies not under contract with ScripNet. In addition to serving as a PBM for Texas Mutual with respect to

6

claims originating from its network pharmacies, the services ScripNet has provided the carrier include estimating the U&C charges the carrier is required to pay on pharmacy reimbursement claims originating from pharmacies that are not ScripNet network pharmacies ("non-network" pharmacies). WorkingRx alleges that ScripNet and Texas Mutual "conspired" to "unlawfully injure" it by creating an estimated U&C for Texas Mutual to apply to these reimbursement claims that is lower than that to which WorkingRx is actually entitled under the statutes and rules governing pharmacy reimbursements.[5]

---

[5] Texas Mutual and WorkingRx (or Apollo, specifically) have a history of disputes regarding the amounts Texas Mutual has paid it on the pharmacy reimbursement claims it submits to the carrier. In 2001, the carrier sued Apollo and four pharmacy chains alleging that the defendants had been over-billing pharmacy reimbursement claims based on improperly calculated U&C estimates. Texas Mutual asserted causes of action for negligent misrepresentation and money had and received, and sought recovery of the alleged overpayments. As we detail below, the defendants successfully argued that the district court lacked subject-matter jurisdiction over the suit on the basis that Texas Mutual's claims were medical fee disputes that fell within the Division's exclusive jurisdiction. *See Texas Mut. Ins. Co. v. Eckerd Corp.*, 162 S.W.3d 261, 263-67 (Tex. App.—Austin 2005, pet. denied).

In addition to suing to recover alleged overpayments on past pharmacy reimbursement claims, Texas Mutual took action in response to pharmacy reimbursement claims being presented by Apollo on an ongoing basis. Texas Mutual began paying these claims based on its own estimate of the originating pharmacies' U&C for prescription drugs. This prompted Apollo to file several thousand medical fee-dispute proceedings in the Division between February 2003 and November 2004. These proceedings gave rise to the litigation addressed in *Texas Mutual Insurance Co. v. Apollo Enterprises., Inc.*, No. 03-09-00054-CV, 2009 Tex. App. LEXIS 8315, at *17 (Tex. App.—Austin Oct. 29, 2009, no pet. h.) (mem. op.), discussed below.

ScripNet and Texas Mutual, which has filed an amicus brief, emphasize this history in suggesting that WorkingRx is artfully pleading causes of action against ScripNet in an attempt to re-litigate the same pharmacy reimbursement claims at issue in *Apollo*. At this juncture, however, there are no issues before us regarding whether Apollo's prior litigation gives rise to claim or issue preclusion barring WorkingRx's claims against ScripNet. Rather, our sole question, which we address above, is whether the Division has exclusive jurisdiction over those claims.

The present litigation between WorkingRx and ScripNet began after WorkingRx sent an August 2006 demand letter to ScripNet complaining that ScripNet was "systematically reduc[ing] WorkingRx bills to a contract rate that does not apply" to claims WorkingRx had submitted for payment. WorkingRx's letter further asserted that "there is over $1.3 million owing to WorkingRx on behalf of our insurance carriers and employers (this amount does not include penalties and interest nor claims from our sister company Apollo Enterprises)." In response, ScripNet filed a declaratory-judgment action in Travis County District Court against WorkingRx. It also named as defendants the Division and Texas Mutual Insurance Company, citing their interests in the proceeding.[6] As it later amended its petition, ScripNet sought declarations that its contract rates applied to any reimbursement claims originating from one of its network pharmacies, regardless whether the pharmacy had also contracted with WorkingRx or whether WorkingRx had billed the claim as the pharmacy's assignee; that ScripNet's contract rate was a "negotiated or contract rate" under the Division's rules, or, if not, that the controlling "negotiated or contract rate" was the amount WorkingRx had agreed to pay the pharmacy; and that WorkingRx's purported assignments were void on several grounds. Among these grounds, ScripNet asserted that any purported assignments to WorkingRx that were executed before September 1, 2005, were prohibited by statute. *See* Tex. Lab. Code Ann. § 408.202 (West 2006) ("Benefits are not assignable . . . ."); *cf.* Act of May 29, 2005, 79th Leg., R.S., ch. 265, § 3.234, 2005 Tex. Gen. Laws 469, 549 (eff. Sept. 1, 2005) (current version

---

[6] ScripNet pled that Texas Mutual "is one of the primary carriers with whom ScripNet has a contract to administer claims for reimbursement of pharmacy prescription charges" and that "[w]ith respect to the controversy in this case, the large majority of the cases presented by WorkingRx involve pharmacy claim payments by Texas Mutual."

at Tex. Lab. Code Ann. § 413.0111 (West 2006)) (requiring that Division's rules for reimbursement of prescription medication and services "must authorize pharmacies to use agents or assignees to process claims and act on the behalf of the pharmacies under terms and conditions agreed on by the pharmacies"). In the alternative, ScripNet pled that WorkingRx was required to exhaust its administrative remedies before claiming any reimbursement or "other remedy . . . predicated upon any right to reimbursement" and that WorkingRx's claims for any additional reimbursement for claims originating at either ScripNet network or non-network pharmacies falls within the Division's exclusive jurisdiction.

WorkingRx responded by removing ScripNet's suit to federal court on diversity grounds.[7] The federal court ultimately remanded the case, holding that the claims at issue "arose under" Texas workers' compensation laws. *See* 28 U.S.C.A. § 1445(c) (West 2006). After remand, WorkingRx asserted counterclaims against ScripNet and a cross-claim against Texas Mutual. Against ScripNet, WorkingRx pled causes of action for tortious interference with its contracts with pharmacies, tortious interference with its prospective business relationships with pharmacies, civil conspiracy, business disparagement, and defamation. It also sought a declaratory judgment that none of ScripNet's network contracts applied to pharmacy reimbursement claims submitted by pharmacies to WorkingRx or submitted by WorkingRx to a carrier. Similarly, against both ScripNet and Texas Mutual, WorkingRx sought declarations that ScripNet's contracts did not grant Texas Mutual the right to pay WorkingRx at a ScripNet contract rate.

---

[7] WorkingRx initially filed a separate suit in Nevada federal court, but ultimately dismissed this action.

9

ScripNet filed a plea to the jurisdiction that was ultimately limited to challenging jurisdiction over WorkingRx's tortious interference and civil conspiracy causes of action. ScripNet contended that the district court lacked subject-matter jurisdiction over these causes of action because they were medical fee disputes that the Division had exclusive jurisdiction to determine. *See* Tex. Lab. Code Ann. § 413.031(c); *Eckerd Corp.*, 162 S.W.3d at 263-67; *Howell*, 143 S.W.3d at 428-29, 434-38. Relatedly, ScripNet presented proof that WorkingRx had failed to exhaust these remedies and that the one-year deadline for initiating proceedings to review these medical fee disputes in the Division had already expired. *See* 28 Tex. Admin. Code § 133.307(c)(1)(A) (2009) (generally-applicable deadline of one year after date of disputed service to submit medical fee dispute to Division). Consequently, ScripNet argued, the district court was required to dismiss WorkingRx's claims.

Following a hearing at which only argument and no evidence was presented, the district court granted the plea without stating specific grounds and dismissed WorkingRx's tortious interference and conspiracy causes of action.[8] The district court later severed out the three dismissed causes of action into a separate cause and rendered final judgment. WorkingRx appealed.

## DISCUSSION

In a single issue, WorkingRx contends that the district court erred in dismissing its tortious interference and civil conspiracy causes of action against ScripNet. It argues that these

---

[8] Although the Hon. Stephen Yelenosky signed the final judgment, the Hon. Darlene Byrne signed the order granting ScripNet's plea to the jurisdiction.

causes of action do not present medical fee disputes within the Division's exclusive jurisdiction, but are instead common-law claims that properly invoked the district court's subject-matter jurisdiction.

**Standard and scope of review**

To analyze WorkingRx's appellate complaint, we apply the same standard of review as with other jurisdictional challenges. *See Stinson v. Insurance Co. of the State of Pa.*, 286 S.W.3d 77, 83 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). We begin with WorkingRx's live pleadings. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). The pleader has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause. *Id.* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). Whether the pleader has met this burden is a question of law that we review de novo. *Id.* We construe the pleadings liberally and look to the pleader's intent. *Id.*

When resolving issues presented by the plea to the jurisdiction, we may consider evidence that the parties have submitted. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). A plea to the jurisdiction may also challenge the existence of jurisdictional facts alleged in the pleadings. *Miranda*, 133 S.W.3d at 226-27. To the extent such a challenge implicates the merits of the plaintiff's cause of action, the party asserting the plea has the burden of negating a genuine issue of material fact as to the jurisdictional fact's existence. *Id.* at 228. Whether the party met this burden is a question of law. *Id.* If the party fails to meet this burden or does not challenge a pled jurisdictional fact, we assume the fact is true. *Id.*

Although both ScripNet and WorkingRx presented evidence in connection with the plea to the jurisdiction, ScripNet challenged only the sufficiency of WorkingRx's pleadings

11

and did not attempt to negate specific facts that WorkingRx pled. ScripNet did, however, rely on certain evidence it viewed as relevant to whether WorkingRx's pleadings implicated the Division's exclusive jurisdiction over medical fee disputes: (1) admissions by WorkingRx that as an assignee of pharmacies' reimbursement claims, its rights against carriers were limited to whatever rights the pharmacies themselves possessed; (2) evidence that WorkingRx billed carriers and their PBMs a higher amount that WorkingRx pays to purchase assignments of the reimbursement claims from pharmacies; and (3) evidence that WorkingRx had attempted to invoke the Division's jurisdiction in various other contexts.[9] ScripNet also presented evidence that WorkingRx had not exhausted its administrative remedies with respect to any of the claims on which it was basing its alleged damages in the suit. None of these facts appear to be disputed by WorkingRx for purposes of this proceeding.

**WorkingRx's claims**

Liberally construing WorkingRx's live pleadings, its factual allegations supporting its tortious interference and conspiracy causes of action assert essentially four claims against ScripNet:

• *Incorrect U&C estimates.* With respect to reimbursement claims originating from non-network pharmacies that WorkingRx submitted to Texas Mutual, WorkingRx alleges that ScripNet has furnished "false information" to Texas Mutual and, with the carrier, "conspired to unlawfully injure Apollo and WorkingRx by agreeing to create an 'estimated usual and customary reimbursement' . . . in order to reimburse WorkingRx, Apollo, and pharmacies at a rate lower than to which they were entitled by law." WorkingRx complains that these actions have caused it injury and damage through Texas Mutual's payment of the incorrect lower rate.

---

[9] ScripNet also presented evidence concerning Apollo and WorkingRx's corporate relationship.

- ***Erroneous application of ScripNet contract rates.*** With respect to pharmacy reimbursement claims originating from both ScripNet network and non-network pharmacies that WorkingRx has billed to carriers for which ScripNet serves as a PBM, WorkingRx alleges that ScripNet has wrongly provided "false information" to the carriers that the ScripNet contract rate applies when it does not.[10] This, in turn, has caused the carrier or ScripNet, on its behalf, to pay WorkingRx an inapplicable ScripNet contract rate that is lower than the U&C or AWP-based rates to which WorkingRx is actually entitled.

- ***Causing ScripNet contract rates to apply.*** With respect to any of WorkingRx's assigned pharmacy reimbursement claims that are in fact subject to a ScripNet contract with the originating pharmacy, WorkingRx alleges that ScripNet tortiously interfered with WorkingRx's "valid and enforceable agreements" (or the prospect of same), and/or conspired with Texas Mutual or other carriers to do so, by inducing pharmacies through "misrepresentations," unlawful coercion, and other wrongful acts to breach their contracts with WorkingRx by signing contracts with ScripNet. WorkingRx alleges that these acts, in turn, injured it by causing the ScripNet contract rate to be imposed on the pharmacy reimbursement claims that WorkingRx owns, thereby "reduc[ing] the value of Claims to be assigned."

   This claim is distinguished from the preceding one in presuming that ScripNet contracts actually apply to the underlying pharmacy reimbursement claims in question and that the carrier (or ScripNet as its agent) thus complied with the statutes and rules governing pharmacy reimbursement in paying the contract rates.

- ***Diverting pharmacy reimbursement claims.*** WorkingRx alleges that ScripNet unlawfully and intentionally caused pharmacies under contract with WorkingRx to breach those contracts by submitting their pharmacy reimbursement claims directly to ScripNet, bypassing WorkingRx altogether. It complains that ScripNet's actions caused "impairment of the value of . . . WorkingRx's assignments" by this "diversion" of pharmacy reimbursement claims to which WorkingRx was contractually entitled.

**The Division's exclusive jurisdiction**

Whether the Division has exclusive jurisdiction over these claims is a question of law that we review de novo. *See Thomas v. Long*, 207 S.W.3d 334, 340 (Tex. 2006) (citing *Subaru of*

---

[10] E.g., because the pharmacy is not actually a ScripNet network pharmacy, because the WorkingRx contract controls, or because the ScripNet contract otherwise did not apply to the transaction.

*Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 222 (Tex. 2002)). Our analytical starting point for determining whether the judiciary or an administrative agency has power to adjudicate these claims is article V, section 8 of the Texas Constitution. It provides that a district court's jurisdiction "consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body." Tex. Const. art. V, § 8. The legislature has provided by statute that district courts possess "the jurisdiction provided by Article V, Section 8, of the Texas Constitution," and "may hear and determine any cause that is cognizable by courts of law or equity and may grant any relief that could be granted by either courts of law or equity." Tex. Gov't Code Ann. §§ 24.007-.008 (West 2004). Thus, "[c]ourts of general jurisdiction presumably have subject matter jurisdiction unless a contrary showing is made." *Subaru*, 84 S.W.3d at 220.

By contrast, "there is no presumption that administrative agencies are authorized to resolve disputes. Rather, they may exercise only those powers the law, in clear and express statutory language, confers upon them." *Id.* "Courts will not imply additional authority to agencies, nor may agencies create for themselves any excess powers." *Id.* The courts are not divested by an agency of the subject-matter jurisdiction they would otherwise possess to adjudicate a dispute unless the legislature has granted the agency exclusive jurisdiction, or the sole power to make the initial determination in the dispute. *Id.* at 221.

Whether the legislature has vested exclusive jurisdiction in the agency is determined by examination and construction of the relevant statutory scheme. *Thomas*, 207 S.W.3d at 340

14

(citing *Subaru*, 84 S.W.3d at 221). We look to whether the legislature has enacted express statutory language indicating that the agency has exclusive jurisdiction, or if not, whether a "pervasive regulatory scheme" nonetheless reflects legislative intent that an agency have the sole power to make the initial determination in the dispute. *Id.* (citing *Subaru*, 84 S.W.3d at 223). In so doing, we generally follow ordinary principles of statutory construction.[11] However, because "[a]brogating common-law claims is disfavored" in light of open courts implications, we are not to construe a statute creating an administrative remedy to deprive a person of an established common-law remedy unless the statute "clearly or plainly" reflects the legislature's intent to supplant the common-law remedy with the statutory one. *Cash Am. Int'l, Inc. v. Bennett*, 35 S.W.3d 12, 15-17 (Tex. 2000).

---

[11] Statutory construction presents a question of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the legislature's intent. *Id.* We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g). We consider the words in context, not in isolation. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see Entergy Gulf States, Inc.*, 282 S.W.3d at 437; Tex. Gov't Code Ann. § 311.011(a) (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). We should also read every word, phrase, and expression in a statute as if it were deliberately chosen, and likewise presume that words excluded from the statute are done so purposefully. *See Gables Realty Ltd. P'ship v. Travis Cent. Appraisal Dist.*, 81 S.W.3d 869, 873 (Tex. App.—Austin 2002, pet. denied). Our analysis of the statutory text is also informed by the presumptions that "the entire statute is intended to be effective" and that "a just and reasonable result is intended," Tex. Gov't Code Ann. § 311.021(2) & (3) (West 2005), and consideration of such matters as the object sought to be attained, circumstances under which the statute was enacted, legislative history, and consequences of a particular construction, *id.* § 311.023(1), (2), (3), (5) (West 2005). However, only when the statutory text is ambiguous "do we 'resort to rules of construction or extrinsic aids.'" *Entergy Gulf States, Inc.*, 282 S.W.3d at 437 (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)).

In the workers' compensation act, as noted, the legislature has created a comprehensive scheme whereby employees who are covered by workers' compensation insurance and incur "compensable" injuries are provided the exclusive remedy of "workers' compensation benefits" (including "medical benefits" that encompass pharmaceuticals and pharmacy services) in lieu of common-law remedies. *See* Tex. Lab. Code Ann. §§ 406.031, 408.001, .021, .028. In turn, the act gives a health care provider who provides medical benefits to a workers' compensation claimant, including a pharmacy, the right to reimbursement from the workers' compensation carrier that covers the employee. *See id.* § 408.027(a). The legislature has conferred extensive authority on the Division to regulate the amounts of reimbursement health care providers can obtain, *see id.* § 408.028; *see also id.* §§ 413.011-.012, including promulgating by rule a "fee schedule" for pharmacy and pharmaceutical services that will "provide reimbursement rates that are fair and reasonable," "assure adequate access to medications and services for injured workers," and "minimize costs to employees and insurance carriers." *See id.* § 408.028(f). The legislature has mandated that "[i]nsurance carriers must reimburse for pharmacy benefits and services using the fee schedule as developed by this section, or at rates negotiated by contract." *See id.* § 408.028(g); *see also id.* § 413.015(a) (West 2006) (requiring that "[i]nsurance carriers shall make appropriate payment of charges for medical services provided under this subtitle"). In addition to regulating reimbursement amounts, the legislature has imposed statutory deadlines for health care providers to submit reimbursement claims to carriers, as well as deadlines for the carrier to pay or take other prescribed actions in response to the claim. *See id.* § 408.027. Furthermore, the legislature has provided for administrative review and auditing of carriers' compliance with these requirements, as

16

well as administrative enforcement of carriers' payment obligations. *See id.* §§ 413.015(b)-(c), .016 (West 2006).

The legislature has also charged the Division with making an initial determination in certain disputes over the amounts carriers pay health care providers under the statutes and rules governing reimbursement. Under section 413.031, "[a] party, including a health care provider, is entitled to a review of a medical service provided or for which authorization of payment is sought if a health care provider is: (1) denied payment or paid a reduced amount for the medical service rendered[[12]]; (2) denied authorization for the payment for the service requested or performed if authorization is required or allowed . . . ; (3) ordered by the commissioner to refund a payment received; or (4) ordered to make a payment that was refused or reduced for a medical service rendered." *Id.* Generally speaking, there are two types of "review of a medical service" that can be conducted under this section.[13] The first is a review of the "medical necessity" of a health care service, which is currently performed by an independent review organization (IRO). *See id.* § 413.031(d)-(e-3), (g)-(I). The other type of review concerns "disputes over the amount of payment due for services determined to be medically necessary and appropriate for treatment of a

---

[12] If, in response to a reimbursement claim from a health care provider, "an insurance carrier disputes the amount of payment or the health care provider's entitlement to payment," the carrier is required to send to the Division, the provider, and the injured employee "a report that sufficiently explains the reasons for the reduction or denial of payment for health care services provided to the employee." Tex. Lab. Code Ann. § 408.027(e). The carrier is entitled to a "hearing" under section 413.031 of the act. *See id.* § 413.031(a).

[13] *See Continental Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 396 & n.2 (Tex. 2000) (observing that section 413.031 governs "certain types of medical benefits disputes . . . fee disputes and preauthorization disputes," and that the general dispute resolution procedures of chapter 410 of the act would govern "when the carrier denies liability for payment of medical benefits on the basis that the injury is not compensable").

compensable injury," commonly termed "medical fee disputes." *Id.* § 413.031(c). In resolving medical fee disputes, "the role of the division is to adjudicate the payment given the relevant statutory provisions and . . . rules." *Id.*

Following review of medical necessity or medical fee disputes, the legislature has provided during most of the time period relevant to this case that an aggrieved party may obtain a contested-case hearing before the State Office of Administrative Hearings. Act of May 3, 1995, 74th Leg., R.S., ch. 980, § 1.43, 1995 Tex. Gen. Laws 4912, 4923 (eff. Sept. 1, 1995) (providing for contested-case hearing before SOAH); Act of May 29, 2005, 79th Leg., R.S., ch. 265, § 3.245, 2005 Tex. Gen. Laws 553, 554 (eff. Sept. 1, 2005) (repealing SOAH contested-case hearing provision); *see also* Act of May 18, 2007, 80th Leg., R.S., ch. 1007, § 2, 2007 Tex. Gen. Laws 3525, 3525 (eff. Sept. 1, 2007) (again providing for a SOAH contested-case hearing). A party who has exhausted the administrative remedies and is aggrieved by the final administrative decision has had the right to seek judicial review under the substantial evidence standard of the Administrative Procedures Act. *Id.* §§ 413.031(k-1), .0311(d). Summarizing this statutory framework, the Texas Supreme Court has observed:

> Carriers do not make the final determination of the fees for disputed claims. If a carrier and a provider disagree on the reimbursement amount, [the Division], not the carrier, makes the decision on the proper payment, subject to review. Any party that is not satisfied with the outcome may continue the review process through SOAH and then the courts.

*Texas Workers' Comp. Comm'n v. Patient Advocates*, 136 S.W.3d 643, 656-57 (Tex. 2004); *see also American Motorists Ins. Co. v. Fodge*, 63 S.W.3d 801, 803 (Tex. 2001) (citing section 413.031)

18

("The [Division] has jurisdiction of disputes over . . . preauthorization of medical care, and reimbursement of medical expenses.") (footnotes omitted).

As the Texas Supreme Court has emphasized, "The Workers' Compensation Act vests the power to award compensation benefits solely in the [Division], subject to judicial review." *Fodge*, 63 S.W.3d at 803 (quoting *Saenz v. Fidelity & Guarantee Ins. Underwriters*, 925 S.W.2d 607, 612 (Tex. 1996)). A logical extension of this principle, the supreme court has held, is that a court has no jurisdiction to award damages against a carrier for deprivation of workers' compensation benefits to an injured worker, except on judicial review, "without a determination by the [Division] that such benefits were due." *Id.* at 804. This is so even if such claims are couched in terms of tort or statutory violations, because awarding "damages based on a denial of benefits" is "tantamount to ordering that the care be paid for and would . . . circumvent the [Division's] exclusive authority to decide that issue." *Id.*; *accord Pickett v. Texas Mut. Ins. Co.*, 239 S.W.3d 826, 835-36 (Tex. App.—Austin 2007, no pet.) (following *Fodge* in holding that workers' common-law claims for damages against workers' compensation carrier allegedly arising from carrier's "denials, delays, interruptions, and premature terminations of medical treatment" fell within Division's exclusive jurisdiction); *In re Texas Mut. Ins. Co.*, 157 S.W.3d 75, 81 (Tex. App.—Austin 2004, orig. proceeding) (breach-of-contract claim for damages allegedly caused by wrongful denial of benefits under policy fell within Division's exclusive jurisdiction). As we explained in *Pickett*, "The issue is not whether a particular type of claim, such as a tort or statutory claim, is within the exclusive jurisdiction of the [Division]. Rather, the determination of whether any type of claim is

19

within the exclusive jurisdiction of the [Division] depends on whether the claim is based on an alleged delay or denial of a workers' compensation benefit." 239 S.W.3d at 836.

Applying the rationale of *Fodge* to the statutory framework governing review of medical fee and medical necessity disputes, this Court has held that the Division had exclusive jurisdiction over claims that a chiropractor had filed in justice court against workers' compensation insurance carriers seeking payment of health care reimbursement claims that the carriers had either partially paid or denied. *See Howell*, 143 S.W.3d at 437-38. The Court concluded that "the statutory scheme demonstrates that the legislature has granted to the [Division] the sole authority to make the initial determination in a medical fee or medical necessity dispute." *Id.* at 434-38.

Subsequently, in *Eckerd*, we considered whether the Division had exclusive jurisdiction over causes of action for negligent misrepresentation and money had and received that Texas Mutual had asserted against Apollo and various pharmacy chains to recover alleged past over-payments the carrier had made. 162 S.W.3d at 263-67. The dispute centered on competing calculations of the pharmacies' U&C. *Id.* at 263. Apollo and the other defendants argued that Texas Mutual's causes of action were medical fee disputes and thus within the Division's exclusive jurisdiction. Relying on *Howell* and *Fodge*, this Court agreed. In so doing, we also dispelled any notion that Texas Mutual's claims, while couched in terms of common law and equity, were governed by *Cash America*'s rule that statutes should not be construed to deprive citizens of common-law rights unless the legislature has clearly expressed that intent. *See Cash Am.*, 35 S.W.3d at 16-18. In the Court's view, "Texas Mutual's claims are 'common law' in name only," reasoning:

20

> Texas Mutual alleges that Defendants over-charged it and negligently misrepresented to Texas Mutual that they were charging the correct amount. Both of these claims derive from the statutory provision setting the maximum allowable reimbursement for pharmaceuticals. At common law, there is no standard or duty to charge a particular amount for prescription drugs; only the statute provides a standard for determining whether Defendants charged Texas Mutual an excessive amount. Therefore, the supreme court's concern in *Cash America* for preserving consumers' common law claims is inapposite to the context of this case, where we have two claims that cannot be adjudicated without also adjudicating the proper meaning of the "maximum allowable reimbursement" provided in the Pharmaceutical Fee Guideline.

*Eckerd Corp.*, 162 S.W.3d at 266 (footnotes omitted). The Court also noted that the Division had the authority to grant Texas Mutual the same type of relief it was seeking in its lawsuit—damages, interest, and injunctive and declaratory relief—in the form of ordering providers to refund excess amounts with interest and imposing other sanctions. *Id.* at 266 n.12. "The ability of the [Division] to fully compensate an injured party, to sanction parties that violate the Act, and to establish and enforce the Act's provision," the Court reasoned, "further demonstrate the legislature's intent to grant the [Division] exclusive jurisdiction over these claims." *Id.* (contrasting the limited "like-kind" administrative remedy at issue in *Cash America*).

WorkingRx argues that its claims are distinguishable from those at issue in *Howell* and *Eckerd*, as well as those in *Fodge* and other cases involving analogous disputes over workers' compensation benefits. It contrasts those claims, which WorkingRx characterizes as disputes over a workers' compensation carrier's liability for benefits or reimbursement under the workers' compensation act and rules, to its claims against ScripNet, which it views as turning on the parties' respective rights and duties under contract or tort principles. And ScripNet, WorkingRx adds, is not a workers' compensation insurance carrier like the defendants in *Howell* and *Fodge* or

21

the plaintiff in *Eckerd*, but a PBM, and has no duties under workers' compensation law to pay pharmacies. Similarly, WorkingRx asserts, neither the legislature nor the Division has provided a procedure whereby a pharmacy (much less WorkingRx, as its assignee) could prosecute medical fee disputes against ScripNet in the Division, much less claims sounding in tort or contract. To the contrary, WorkingRx asserts, the relevant statutes and rules require that the respondent in a medical fee dispute initiated by a health care provider is the carrier, not a PBM or other agent of the carrier. *See* Tex. Lab. Code Ann. §§ 408.027, 413.031; 28 Tex. Admin. Code § 133.307(d)(2); *see also* Tex. Lab. Code Ann. § 413.015(a) ("An insurance carrier may contract with a separate entity to forward payments for medical services . . . . The separate entity is subject to the direction of the insurance carrier, and the insurance carrier is responsible for the actions of the separate entity under this subsection."). Consequently, WorkingRx reasons, it "has *no* remedy against ScripNet in the Division" to exhaust, belying legislative intent to grant the Division exclusive jurisdiction to adjudicate its claims against ScripNet. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207-08 (Tex. 2002) (citing fact that motor vehicle code lacked "any procedure through which the Board may resolve a prospective transferee's claim that a manufacturer unlawfully refused to accept a dealer's transfer request—coupled with the Board's inability to award damages" as belying legislative intent to delegate exclusive jurisdiction to the Board to determine such claims); *cf. Eckerd Corp.*, 162 S.W.3d at 266 n.12 (citing, as additional support for its conclusion that the Division had exclusive jurisdiction over Texas Mutual's claims, the fact that the Division could provide the remedies Texas Mutual was seeking).

22

ScripNet contends that WorkingRx's claims are merely artfully pled medical fee disputes, observing that *Fodge* and progeny like *Eckerd* and *Pickett* have looked past common-law labels to consider whether the pleadings, in substance, present disputes falling within the Division's exclusive jurisdiction. ScripNet characterizes WorkingRx's claims, in substance, as simply the converse of the claims in *Eckerd*—complaints by pharmacies (or assignees) that workers' compensation carriers have *under*paid the reimbursement amounts they owe under the pharmacy fee guidelines, as opposed to *Eckerd*'s carrier's suit against pharmacies complaining of *over*payments under the guidelines.[14]

ScripNet dismisses the notion that WorkingRx's claims are distinguishable on the basis that WorkingRx sued ScripNet rather than a workers' compensation carrier. While WorkingRx has nominally named a third party as a defendant, ScripNet reasons, it remains that WorkingRx's claims require determination of whether WorkingRx was paid the correct amount on its pharmacy reimbursement claims by a workers' compensation carrier or agent of a carrier. ScripNet further cautions that if WorkingRx can circumvent the Division's exclusive jurisdiction merely by suing it rather than a carrier, "[i]t opens the door for *anyone*, injured worker or provider, to clam that because the insurance carrier paid less than the workers' compensation contract of insurance requires because of advice, recommendations, decisions, or actions by any vendor, bill review company, medical bill processing agent, Utilization Review Agent . . . , third party administrator, or adjustor that a tortious interference claim is proper since exhaustion is not required."

---

[14] In this connection, ScripNet also emphasizes that Apollo was one of the prevailing parties in *Eckerd* who argued that the Division had exclusive jurisdiction over Texas Mutual's claims.

23

We conclude that two of WorkingRx's four claims present medical fee disputes and therefore implicate the Division's exclusive jurisdiction. WorkingRx's claim that ScripNet injured it by furnishing "false information" to or "conspiring" with Texas Mutual so as to cause the carrier to apply an improperly calculated U&C and "reimburse WorkingRx, Apollo, and pharmacies at a rate lower than to which they were entitled by law"—the first claim described in the list above—is a claim based on Texas Mutual's denial or reduction of payment for the pharmaceutical services in a manner allegedly depriving WorkingRx of amounts the carrier owed it under the statutes and rules governing pharmacy fee reimbursement—a medical fee dispute. *See* Tex. Lab. Code Ann. § 413.031(c) (empowering the Division to "resolv[e] disputes over the amount of payment due for services determined to be medically necessary and appropriate for treatment of a compensable injury"); *Eckerd Corp.*, 162 S.W.3d at 263-67; *Howell*, 143 S.W.3d at 428-29. This is true regardless of WorkingRx's attempts to couch its claim in terms of tort duties. *See Eckerd Corp.*, 162 S.W.3d at 263-67; *Howell*, 143 S.W.3d at 428-29, 434-38; *see also Fodge*, 63 S.W.3d 803-04; *Pickett*, 239 S.W.3d at 836.

The same is true of WorkingRx's claim that ScripNet wrongfully caused its contract rate to be applied to pharmacy reimbursement claims submitted by WorkingRx when a higher U&C- or AWP-based rate instead applied (its second claim in the above list). We acknowledge that resolution of this claim may turn to some extent on whether ScripNet's contract rates apply to pharmacy reimbursement claims assigned to WorkingRx, an issue of contract construction that is traditionally for the courts. In fact, as WorkingRx points out, ScripNet itself has requested declaratory relief from the district court on the same issue. Nonetheless, it remains that WorkingRx

is complaining that carriers (or ScripNet, as the carriers' agent) have paid it the wrong amount (a contract rate rather than a U&C- or AWP-based rate) under the statutes and rules governing pharmacy reimbursement. *See* Tex. Lab. Code Ann. § 408.028(g) ("Insurance carriers must reimburse for pharmacy benefits and services using the fee schedule as developed by this section, or at rates negotiated by contract."); 28 Tex. Admin. Code § 134.503(a) (MAR is lesser of U&C, AWP, or "a negotiated or contract amount"). Although the determination of which rate applies may entail resolution of embedded contract-construction issues, the claim nevertheless falls within the "disputes over the amount of payment due for services determined to be medically necessary and appropriate for treatment of a compensable injury" that the legislature has given the Division exclusive jurisdiction to decide. Tex. Lab. Code Ann. § 413.031(c);[15] *Eckerd Corp.*, 162 S.W.3d at 263-67; *Howell*, 143 S.W.3d at 428-29, 434-38; *see also Fodge*, 63 S.W.3d at 803-04; *Pickett*, 239 S.W.3d at 835-36; *see also* Tex. Gov't Code Ann. § 2001.174(2)(D) (West 2008) (on judicial review, party aggrieved by agency order can challenge it as "affected by other error of law").

WorkingRx, in fact, "agrees that it has a potential medical fee dispute with insurance carriers" with respect to these claims, but insists that it "does not have a medical fee dispute with ScripNet." However, the fact that WorkingRx has opted to sue a third party rather than the carriers, as ScripNet suggests, does not in itself control whether its claims are medical fee disputes that fall

---

[15] In 2006, the Division amended its rules to require dismissal of medical fee disputes where "the Division determines the medical fee dispute is for health care services provided pursuant to a private contractual fee arrangement." 31 Tex. Reg. 10314 (Dec. 22, 2006) (codified at 28 Tex. Admin. Code § 133.307(e)(3)(F) (2009)). While excluding disputes arising under the contracts themselves, we observe that this rule, consistent with our analysis above, contemplates that the Division will determine the threshold question of whether or not the contract applies to the health care services at issue.

within the Division's exclusive jurisdiction. What matters is whether the claims are based on the alleged failure of carriers to pay WorkingRx in compliance with the statutes and rules governing pharmacy fee reimbursement. That is precisely the basis for these claims—ScripNet is alleged to have injured WorkingRx by causing carriers (or ScripNet, in its capacity as their agent) to pay less reimbursement than WorkingRx is entitled to under the statutes and rules. Only the Division has power to initially determine the amounts WorkingRx is entitled to be paid by the carriers.

The First Court of Appeals applied a similar analysis in rejecting an argument that the Division's exclusive jurisdiction did not extend to tort claims asserted by a workers' compensation claimant against doctors who allegedly provided false information causing a carrier to deny the claim. *See Macias v. Schwedler*, 135 S.W.3d 826, 830-31 (Tex. App.—Houston [1st Dist.] 2004, pet. denied). "The logic of *Fodge*," the court reasoned, "applies to the doctor defendants as well as to the carrier defendants. The trial court could not adjudicate the claims against [the doctors] without a determination of [the claimant's] claim for benefits. Such a determination may not be made by the trial court without a determination by the [Division]." *Id.* The same logic applies to WorkingRx's first and second claims here.

Finally, in a post-submission brief, WorkingRx argues that a recent decision of this Court involving Apollo and Texas Mutual establishes that, for a different reason, it "did not have any administrative remedies to exhaust" with respect to any medical fee disputes it had with carriers during most of the time period at issue here. *Texas Mut. Ins. Co. v. Apollo Enters., Inc.*, No. 03-09-00054-CV, 2009 Tex. App. LEXIS 8315 (Tex. App.—Austin Oct. 29, 2009, no pet. h.) (mem. op.). *Apollo* arose out of several thousand medical fee-dispute proceedings that Apollo filed against

26

Texas Mutual and the Division between February 2003 and November 2004. At that time, the labor code and Division rules did not explicitly permit assignees of pharmacies to initiate medical fee-dispute proceedings in the Division. *See id.* at \*4-5. Construing the rules then in effect, the Division concluded that Apollo did not have standing to initiate the proceedings. *Id.* at \*5. Apollo sought judicial review in Travis County District Court. Apollo and Texas Mutual filed cross-motions for summary judgment. The district court granted Apollo's motion in part, reversing the Division's order holding that Apollo lacked standing but also granting Texas Mutual's motion and affirming the Division's dismissal of some of the claims as not timely filed. The district court remanded Apollo's other claims to the Division. Texas Mutual appealed the district court's judgment reversing and remanding the Division's order that Apollo lacked standing. This Court agreed with Texas Mutual, holding that the Division's interpretation of its own rules was not plainly erroneous or inconsistent with the rules or underlying statute. *Id.* at \*10-17.

Effective September 1, 2005, the legislature enacted section 413.0111 of the labor code, which mandated that the Division's rules for reimbursement of prescription medication and services "must authorize pharmacies to use agents or assignees to process claims and act on the behalf of the pharmacies under terms and conditions agreed on by the pharmacies." Act of May 29, 2005, 79th Leg., R.S., ch. 265, § 3.234, 2005 Tex. Gen. Laws 469, 549 (eff. Sept. 1, 2005) (current version at Tex. Lab. Code Ann. § 413.0111 (West 2006)). The Division enacted rule amendments to implement this requirement effective May 2, 2006. 31 Tex. Reg. 3553-55, 3557-58 (May 2, 2006) (codified at 28 Tex. Admin. Code §§ 133.2, .20, .240 (2009)). However, as WorkingRx observes, the former rules we addressed in *Apollo* governed "during most of the time period relevant to Apollo

27

and WorkingRx's claims" here. As for pharmacy reimbursement claims arising during that period, *Apollo*, WorkingRx contends, establishes that the Division lacked jurisdiction to decide any medical fee disputes WorkingRx had with carriers or that the Division's administrative remedies were otherwise "inadequate." Either way, WorkingRx urges, it was not required to exhaust any administrative remedies against carriers before proceeding against ScripNet in court. *See Texas Educ. Agency v. Cypress-Fairbanks Indep. Sch. Dist.*, 830 S.W.2d 88, 90 (Tex. 1992) ("[A] trial court may intercede before administrative remedies are exhausted where the administrative agency lacks jurisdiction.") (citing *Westheimer Indep. Sch. Dist. v. Brockette*, 567 S.W.2d 780, 785 (Tex. 1978)); *Public Util. Comm'n v. Pedernales Elec. Coop, Inc.*, 678 S.W.2d 214, 220 (Tex. App.—Austin 1984, writ ref'd n.r.e.) ("The doctrine [of exhaustion of administrative remedies] comes into effect only if the administrative remedy is realistically adequate to protect the asserted claims."). We disagree.

WorkingRx's argument presumes that it has a cause of action against carriers to recover particular pharmacy reimbursement amounts that exists independently from the workers' compensation act. It does not. As we explained in *Eckerd*, the right to recover any particular amount of reimbursement from a workers' compensation insurance carrier for services provided by a pharmacy to an injured worker is entirely a function of the workers' compensation act and Division rules. *Eckerd*, 162 S.W.3d at 266. And, when there is a dispute over the amount the carrier owes under the act and rules, the legislature has delegated to the Division sole authority to initially determine that amount. *See* Tex. Lab. Code Ann. § 413.031. When exercising this power, furthermore, the Division would necessarily have to decide whether the person attempting to initiate

28

the medical review is "[a] party . . . entitled to a review of a medical service provided or for which authorization of payment is sought if a health care provider is: (1) denied payment or paid a reduced amount for the medical service rendered." *Id.* § 413.031(a). This, in fact, is precisely what the Division did in *Apollo*. *See* 2009 Tex. App. LEXIS 8315, at *4-5.

In essence, WorkingRx reasons that it is excused from exhausting its administrative remedies against the carriers because *Apollo* implies that those proceedings would have yielded only final orders that WorkingRx lacked standing to pursue additional reimbursement amounts from the carriers. However, the significance of such an outcome is not that it would excuse WorkingRx from exhausting its administrative remedies, but that it would establish that WorkingRx had no right under the workers' compensation statutes and rules to compel additional payments from the carriers (which in turn would mean that WorkingRx could not prove that ScripNet's conduct injured it by causing carriers to pay less reimbursement than they were obligated to pay). Parties cannot avoid exhaustion-of-remedies requirements merely because they might be unsuccessful before the agency. *See In re Liberty Mut. Fire Ins. Co.*, No. 08-0742, ___ S.W.3d ___, ___, 2009 Tex. LEXIS 627, at *5 (Tex. Aug. 28, 2009) (orig. proceeding).

Because WorkingRx's first and second claims present medical fee disputes that implicate the Division's exclusive jurisdiction, the district court did not err in granting ScripNet's plea to the jurisdiction to that extent. In the district court, ScripNet advocated that the court dismiss rather than abate WorkingRx's claims because the deadline for WorkingRx to file these medical fee disputes in the Division had already expired, precluding WorkingRx from curing the jurisdictional defect. *See Fodge*, 63 S.W.3d at 805. On appeal, WorkingRx does not dispute that it is time-barred

from initiating medical fee-dispute proceedings before the Division with respect to the underlying pharmacy reimbursement claims at issue. Accordingly, the district court did not err in dismissing WorkingRx's first and second claims for want of subject-matter jurisdiction.

However, we reach a different conclusion with respect to WorkingRx's remaining two claims—that ScripNet wrongfully caused pharmacies under contract with WorkingRx to bind themselves to ScripNet contract rates (its third claim), and that ScripNet wrongfully "diverted" pharmacy reimbursement claims to which WorkingRx was contractually entitled (its fourth claim). These claims, unlike the first two, are not based on the failure of carriers to pay WorkingRx pharmacy fee reimbursements in compliance with the workers' compensation statutes and rules. To the contrary, both presume that the carriers paid WorkingRx the correct amounts, if any, that the carriers owed it. With respect to WorkingRx's third claim, WorkingRx concedes that the pharmacies (and thus WorkingRx, as assignee) are bound to the ScripNet contract rates and that the carriers (or ScripNet, as their agent) paid it in accordance with those rates. Similarly, regarding its "diversion" claim, WorkingRx concedes that it has no right under the workers' compensation statutes and rules to recover anything from the carriers for the pharmacy services at issue because the pharmacies never assigned their reimbursement claims to WorkingRx. In either case, there is no "dispute[] over the amount of payment due for services determined to be medically necessary and appropriate for treatment of a compensable injury." Tex. Lab. Code Ann. § 413.031(c). The legal injury that is the basis for WorkingRx's claims is not a carrier's failure to pay it pharmacy reimbursements in compliance with the workers' compensation statute and rules, but the loss of contractually-

guaranteed opportunities to seek such reimbursement from carriers allegedly due to ScripNet's tortious conduct.

In these respects, these claims are analogous to the negligence claim we addressed in *In re Texas Mut. Ins. Co.*, 157 S.W.3d at 81-82. In that case, we held that a breach-of-contract claim against a carrier for failure to pay workers' compensation benefits was controlled by *Fodge* and within the Division's exclusive jurisdiction because it "presupposes the existence of a workers' compensation policy and quite plainly seeks benefits due under that policy." *Id.* at 80-81. However, we reached a different conclusion as to a claim seeking damages for the carrier's alleged negligence in causing a gap in coverage. That claim, we reasoned, was predicated upon the absence of workers' compensation coverage and was not seeking benefits or damages arising from the wrongful deprivation of benefits the carrier owed. *See id.* at 81.

Also instructive is *Texas Mutual Insurance Co. v. Texas Department of Insurance, Division of Workers' Compensation*. *See* 214 S.W.3d 613, 615, 617-21 (Tex. App.—Austin 2006, no pet.). We held that a dispute regarding the effective date of an employer's liability insurance policy did not fall within the Division's exclusive jurisdiction to award benefits, even though this policy was contained in a single policy form with the employers' workers' compensation policy and had a common effective date, because the plaintiffs were not asserting a claim for workers' compensation benefits or based on their deprivation, but only a negligence claim that presumed the absence of workers' compensation coverage and any entitlement to benefits. *Texas Mut. Ins. Co.*, 214 S.W.3d at 619. We reasoned that "[t]he foundation of our analysis in *Texas Mutual* and the supreme court's analysis in *Fodge* was a pending claim whose resolution required a determination

31

of a claimant's entitlement to workers' compensation benefits," and that the negligence claim did not assert such an entitlement. *Id.* Similarly, WorkingRx's third and fourth claims presuppose that it was paid the correct amount of reimbursement by carriers and their agents, and does not assert an entitlement to any additional reimbursement from them.

WorkingRx offers perhaps an even better analogy. It compares its claims to allegations that ScripNet deprived it the opportunity to recover all or part of the value of its pharmacy reimbursements by stealing WorkingRx's outgoing mail, destroying WorkingRx's computer system, or burning down WorkingRx's building. We agree with WorkingRx that the legislature could not have intended "disputes over the amount of payment due for services determined to be medically necessary and appropriate for treatment of a compensable injury" to sweep so broadly.

On the other hand, ScripNet observes that WorkingRx cannot recover on its claims without prevailing on several of what it terms "workers' compensation threshold issues." It points out that WorkingRx cannot prove legal injury from alleged interference with its contracts with pharmacies if the ScripNet contracts are illegal or void under public policy. *See Travel Masters, Inc. v. Star Tours, Inc.*, 827 S.W.2d 830, 833 (Tex. 1991) (plaintiff could not recover on theory of tortious interference because contract was illegal and unenforceable on grounds of public policy). ScripNet contends that prior to the 2005 amendments that added labor code section 413.0111 and the May 2, 2006 Division rule amendments, certain provisions in WorkingRx's contracts with pharmacies were illegal: (1) terms providing for assignments of pharmacy reimbursement claims; (2) terms contemplating that WorkingRx, rather than pharmacies themselves, would submit bills to

carriers; (3) terms contemplating that WorkingRx could "mark up" pharmacy bills; and (4) terms permitting WorkingRx to remit to pharmacies less than the full amount of reimbursement it collected from carriers. Similarly, ScripNet observes that WorkingRx's alleged damages consist principally of amounts it alleges it would have recovered from carriers had ScripNet not "diverted" potential assignments or caused the application of the ScripNet contract rates. To recover such damages, ScripNet urges, WorkingRx must prove the MAR that would have applied absent ScripNet's conduct, which in turn raises the same issues over the choice of alternative measures, proper calculation of U&C, etc., that arise in medical fee disputes. ScripNet further suggests that *Apollo* is relevant to WorkingRx's ability to prove the reimbursements that might have been, inasmuch as it establishes that WorkingRx would have been unable to initiate medical review proceedings in the Division if a carrier underpaid it for reasons independent of ScripNet's conduct.

ScripNet argues that the Division has exclusive jurisdiction to decide each of these "workers' compensation threshold issues," and that WorkingRx accordingly was required to exhaust these administrative remedies before proceeding in court.[16] Similarly, Texas Mutual, in an amicus brief, argues that if we conclude WorkingRx's "diversion" claim falls outside the Division's exclusive jurisdiction, the Division nonetheless has primary jurisdiction to determine "several core issues of workers' compensation law" raised by that claim: (1) the validity of WorkingRx's

---

[16] ScripNet also identifies three other "workers' compensation threshold issues": (1) "Do the ScripNet contracts apply to any or all of the WorkingRx assigned pharmacy claims?"; (2) "Will DWC determine the proper amount of reimbursement if the amount to be paid is based on contracts?"; and (3) "Are the WorkingRx claims barred under the one-year rule for requesting dispute resolution [in the Division]?" The first two issues are subsumed within WorkingRx's second claim but are conceded for purposes of its third and fourth claims. The third issue arises only if the Division has exclusive jurisdiction over a particular claim.

33

assignments from pharmacies; (2) WorkingRx's right to "mark up" pharmacy bills and make carriers pay them; (3) the amounts due WorkingRx under the workers' compensation act and Division rules; and (4) the standing issue addressed in *Apollo*. In response, WorkingRx urges that "the Division has exclusive jurisdiction over types of disputes, rather than types of issues." The Division's jurisdiction, WorkingRx reasons, "is exclusive with respect to particular issues only to the extent those issues arise in the context of a particular dispute over which the Division has exclusive jurisdiction."

In section 413.031 of the workers' compensation act, the legislature has created mechanisms through which the Division is to adjudicate disputes over the respective rights and duties of workers' compensation insurance carriers and health care providers in regard to payment for care provided to workers' compensation claimants. Indeed, chapter 413 as a whole extensively regulates those respective rights and duties. But WorkingRx's third and fourth claims presume that carriers have complied with their duties under the workers' compensation act and rules. These claims do not present medical fee disputes. While giving the Division exclusive jurisdiction to decide medical fee disputes, the legislature did not create a mechanism through which the Division could determine the reimbursement amount that a carrier hypothetically *would have been* required to pay a provider on reimbursement claims that a third party's tortious conduct deprived the provider of the opportunity to present to the carriers. That is not the same issue that is presented in a medical fee dispute. *See Austin Chevrolet, Inc. v. Motor Vehicle Bd.*, 212 S.W.3d 425, 431-32 (Tex. App.—Austin 2006, pet. denied) (while recognizing motor vehicle board's exclusive jurisdiction to decide code-based issues, holding that jurisdiction did not extend to deciding what

34

the board would have decided absent alleged tortious conduct that caused a dealer to abandon a protest); *Texas Logos, L.P. v. Brinkmeyer*, 254 S.W.3d 644, 657 (Tex. App.—Austin 2008, no pet.) (citing *Austin Chevrolet* and concluding that "whatever authority the legislature delegated to TxDOT to determine the best value for the state in awarding the logo sign contract is not implicated or infringed by Texas Logos's tort damages claims, which turn on what the agency probably *would have* decided absent the defendants' alleged tortious conduct"); *see also id.* at 654 (also drawing a comparison to the suit-within-a-suit analysis in legal malpractice cases). Nor has the legislature provided a mechanism through which the Division could determine the various subsidiary issues that might bear upon this what-might-have-been inquiry, such as the legality of WorkingRx's pharmacy contracts and assignments.

The absence of mechanisms for deciding these "workers' compensation threshold issues" convinces us that the legislature did not intend for the Division to have sole authority to initially determine them outside of the context of medical fee disputes. *See Butnaru*, 84 S.W.3d at 207-08 (notwithstanding motor vehicle board's "exclusive, original jurisdiction to regulate those aspects of the distribution, sale, and leasing of motor vehicles as governed by this Act," citing the absence of "any procedure through which the Board may resolve a prospective transferee's claim that a manufacturer unlawfully refused to accept a dealer's transfer request" as belying legislative intent to delegate exclusive jurisdiction to the agency to determine such claims). We reached a similar conclusion regarding the Division's jurisdiction to award workers' compensation benefits in *Texas Mutual Insurance Co. See* 214 S.W.3d at 619 (Division's exclusive jurisdiction is invoked only when there is "a pending claim whose resolution requires a determination of a claimant's

35

entitlement to workers' compensation benefits" and does not extend to "any and all workers' compensation coverage disputes wherever they might arise"). Consequently, the district court had subject-matter jurisdiction to determine these issues in the course of adjudicating WorkingRx's third and fourth claims. *See Subaru*, 84 S.W.3d at 220.

At most, ScripNet's arguments regarding "workers' compensation threshold issues" might go to whether the Division has primary jurisdiction to decide that, as Texas Mutual suggests. Primary jurisdiction applies when (1) an agency is "staffed with experts trained in handling the complex problems in the agency's purview" and (2) "great benefit is derived from an agency's uniformly interpreting its laws, rules, and regulations, whereas courts and juries may reach different results under similar fact situations." *Id.* at 221. However, while termed "primary jurisdiction," the doctrine is actually a principle of judicial prudence or deference that presumes that both the agency and trial court have jurisdiction to make initial determinations in the matter, but nonetheless requires that the trial court refrain from exercising its jurisdiction until the agency has a reasonable opportunity to make an initial determination in the matter. *Id.* Thus, primary jurisdiction, assuming it applies here, would not divest the district court of its subject-matter jurisdiction over WorkingRx's claims.

On the other hand, the specific grounds asserted in ScripNet's plea to the jurisdiction—that WorkingRx failed to "exhaust administrative remedies" and can no longer do so—could conceivably refer to an agency having either exclusive jurisdiction or primary jurisdiction. *See Nelson v. City of Dallas*, 278 S.W.3d 90, 95-96 (Tex. App.—Dallas 2009, pet. denied). However, while Texas Mutual has filed an amicus brief addressing primary jurisdiction, and

36

while some of ScripNet's arguments may properly go to primary rather than exclusive jurisdiction, ScripNet has purported to rely solely on exclusive jurisdiction as a basis for affirming the judgment of dismissal. Likewise, WorkingRx has not yet addressed the applicability of primary jurisdiction under these circumstances. Nor do the parties appear to have joined issue regarding primary jurisdiction in the district court. To the extent that ScripNet is intending to rely on primary jurisdiction on appeal, we conclude this contention is inadequately briefed. *See* Tex. R. App. P. 38.1(i). Texas Mutual's amicus brief notwithstanding, the question of whether primary jurisdiction applies to the two WorkingRx claims falling outside the Division's exclusive jurisdiction is not yet before us. On remand, the parties will have the opportunity to address the applicability of primary jurisdiction (and any exceptions to that doctrine), among other issues bearing on the ultimate viability of WorkingRx's third and fourth claims.

For these reasons, the district court erred in granting ScripNet's plea to the jurisdiction as to WorkingRx's third and fourth claims and dismissing them. Consequently, we reverse the district court's judgment of dismissal as to those two claims and remand them for further proceedings.

**CONCLUSION**

We affirm the district court's judgment dismissing WorkingRx's claims that ScripNet injured it by wrongfully causing application of incorrect U&C estimates (WorkingRx's first claim) or inapplicable ScripNet contract rates to pharmacy reimbursement claims (second claim). We reverse the judgment dismissing WorkingRx's other claims—that ScripNet injured it by diverting

claims (fourth claim) or causing WorkingRx client pharmacies to bind themselves (and WorkingRx) to ScripNet contract rates (third claim)—and remand them for further proceedings.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop;
    Chief Justice Law Not Participating

Affirmed in part; Reversed and Remanded in part

Filed:   December 4, 2009